The first case set for oral argument today, July 22, 2015, is Case No. 15-6001, N.E., N. Ray Suzette Woodward, Heritage Bank v. Suzette Woodward. Mr. Rourke? Good morning. Good morning. May it please the Court, my name is Kent Rourke. I am appearing this morning on behalf of the appellant, Heritage Bank, in this matter. Initially, I thought it might be appropriate for me to give each of the justices a little bit of background as it relates to this particular case. Dr. Woodward is a pathologist. The debtor in this case is a pathologist. She works in Grinnell, Nebraska. Not only is Dr. Woodward employed as a pathologist, but she also works and owns the clinic in which she works. In 2011, Dr. Woodward, who is present here this morning, filed a petition in bankruptcy under Chapter 7. Subsequent to that time, her case was converted to a case under Chapter 11. At the time that Dr. Woodward filed her bankruptcy proceedings, she had had an ongoing lending relationship with my client, Heritage Bank. At the time of the filing of her Chapter 7 petition, Heritage Bank, somewhere in the neighborhood of $270,000. Ultimately, it was determined through the bankruptcy proceeding that that sum was completely unsecured. Following conversion of the case to a case under Chapter 11, Dr. Woodward and her counsel submitted a number of Chapter 11 plans to the Court for confirmation. Those plans were either amended or, in one case, the Court rejected or refused to confirm her plan. Finally, in December of 2014, the Court did confirm Dr. Woodward's fifth amended Chapter 11 plan, which she orally modified at the confirmation hearing. It is from that order confirming that fifth amended Chapter 11 plan that Heritage Bank has filed this appeal. Now, the three issues that Heritage Bank would like to direct the Court's attention to as it relates to that confirmation order and the confirmation hearing. The first of those, it's the position of Heritage Bank that Dr. Woodward's plan does not comply with the absolute priority rule and, for that reason, should not have been confirmed. Our second issue is that there was no impaired class that accepted Dr. Woodward's amended plan and, for that reason, that the plan should not have been confirmed by the Bankruptcy Court. The third issue, which I'm hoping to talk with you about today, it is our belief that the Bankruptcy Court, in approving Dr. Woodward's plan, which requires her to pay $4,500 a month towards her unsecured creditors, that the Bankruptcy Court erred in determining what her disposable income is and that her disposable income that should be available and paid to unsecured creditors actually exceeds that amount. So those will be the three issues, I guess, I was hoping to discuss with you today. The first issue, as I mentioned, is it is our belief that Dr. Woodward's plan does not comply with the absolute priority rule. And I've wrestled in my head how to exactly approach this with each of the three of you. And I think the three of you have a very good understanding of what this issue is. The fundamental issue that is out there is whether or not the changes that were made to the Bankruptcy Code in 2005 effectively eliminated the absolute priority rule as it relates to individual Chapter 11 debtors or whether it didn't. And we thought that you had the problem because everything that could be said on the subject has been written. Well, and I come here with all due respect, with the firm belief that the three of you probably have a better understanding of this issue than I do. You've probably done more reading on this issue and wrestling with this matter in your courts than I have. Well, you don't have to try to flatter us, but there are parts about this that are very troubling to me because I think the statute is very confusing. Congress probably didn't know what it was doing. But one thing that's troubling to me is that I think your position would be that unless Dr. Woodward proposes a plan that pays 100% to the unsecured creditors, she can't keep any of her property, including her exempt property. Well, I think that's one of the alternatives. I mean, I think that another alternative is she can propose a plan that the unsecured creditors agree to. Yeah, but it doesn't sound like you're ever going to agree to a plan. Well, that might be the case at this point. I don't know that that was the case when she proposed the initial plan. So she could propose a plan that pays you 100% of your claim over the next 30 years. Would that be acceptable to you? Probably not. But I think there are other ways that she could get a plan confirmed. I mean, obviously she could get a plan confirmed that there was something that the creditors and she agreed to. Well, let's be clear. When you say she and the creditors, you're the only one that's objecting to the plan right now. That's right. And if I read the record correctly, she's filed four or five plans. Have you been totally unable to negotiate it? I mean, let's not project into the future something that hasn't happened in the past. What would change going forward that would allow a consensual plan from your client's perspective other than 100% payment? Nothing at this point can change that. Now, what I said earlier, I don't know that that's always been the case, but this has gone on for quite a while, and I think the parties are fairly firmly entrenched. I don't know that that would have been the case all the way through the process. And I guess my other question is, I don't know Nebraska garnishment laws, but why wouldn't she be better off out of bankruptcy just letting you garnish her wages? Wouldn't that be less than $4,500 a month? In all likelihood, yes. So she'd probably be better off. Basically what you're saying is because you objected to her being in Chapter 7, and you're objecting to anything short of 100% in Chapter 11. So basically what you're saying is, as far as you're concerned, she's not entitled to bankruptcy relief. Yeah, I mean, yeah. At the end of the road, yes. And not to put too fine a point on it, but the Elliotts have a lean on the residents, don't they? Correct. So you're the only obstacle to confirmation. You're in a blocking position. You control the case. Unless you get what your demands are. Yeah, no, I agree with you. And let me make sure I understand the object of the debt. This is not an obligation that was extended directly to Dr. Woodward. It was a guarantee of her spouse's business debt. Is that correct? No, I think that's not correct. All right. Dr. Woodward and now her former husband both borrowed money from Heritage Bank. They both signed the promissory notes. But was she involved in that business? Was she an owner? No, she was not involved in Woodward Construction, her husband's business. But the loans weren't necessarily to her construction business. The loans were consolidation notes to pay off credit card debts. Dr. Woodward's student loan debt was refinanced as part of that. So Dr. Woodward, she took some benefit from those loans. It wasn't solely loans to her husband's construction company. That was an element of it, but there was more to it simply than that. Thank you for that clarification. And so I don't want to belabor the point again. I think you all understand the issue here, as you're all three well aware, in the course of kind of taking two alternative approaches. One's defined as the broad view. One's defined as the narrow view. Obviously, the narrow view is the reading of those statutes that we would assert is the correct view under the circumstances. So I don't know that it pays for me to belabor that a whole lot more. The second issue, which I'm not necessarily intending to get into a whole lot either, the Elliotts, as judges indicated, there's essentially two impaired classes, or you can make the argument that there's two impaired classes, and Heritage Bank is of the opinion that there is no impaired class, which has accepted Dr. Woodward's plan. What the Bankruptcy Court pointed to and what Dr. Woodward will point to is that the Elliotts are an impaired class and that they've accepted Dr. Woodward's plan. I think if you take a look at the argument that was set forth in the brief, and there's some case law to support the notion that a post-petition creditor is an individual that can't vote to either accept or reject a Chapter 11 plan. It's set forth in the brief, and I don't know that I can offer a whole lot more than that. And was there a reason that you all didn't appeal the order allowing that claim? Because you had objected to it, I believe. We did, and it was just a decision that was made to continue to object to the plan on that basis rather than appeal the order as it relates to the allowing of that claim. So just a decision we made through the litigation process. And that may or may have not been wrong. I don't know. The final issue, which I guess I want to devote a little bit of time to, is the determination of what Dr. Woodward's disposable income is. Assuming that the first two issues are issues that Dr. Woodward can overcome, there is this ongoing issue as to how much disposable income Dr. Woodward should devote to the payment for unsecured creditors. And there's been a couple of issues that the bankruptcy court didn't help us out a whole lot with. Obviously disposable income is income minus reasonable and necessary expenses. The bankruptcy court didn't provide us with a whole lot of guidance as how Judge Saldino determined what Dr. Woodward's income was. From his comments and from the analysis that he made, I think that he was utilizing Dr. Woodward's 2013 income tax return. My client, Heritage Bank, was, I guess, advocating that that was the appropriate way to determine her income. Dr. Woodward essentially submitted a summary of her operating reports over, I think, a 22-month period as a way of demonstrating her income. I think you were unhappy with the draws because they fluctuated. They did, and I ran the math any number of different times. Depending upon which period I captured, I could manipulate her income by $3,000 or $4,000 a month. If I did 11 months, it would be this amount. If I did 12 months, it might swing significant amounts because Dr. Woodward will have draws in some months. I think one of the most recent operating reports I saw showed a $45,000 draw in one month. But how would you propose to apply a formula then to somebody who has draws? I mean, there has to be some way to do it over a period of time so that someone knows how much needs to be paid. What would your proposal be in terms of how that should be calculated? I really think the best way to do it is the way that we indicated to the court that it ought to be done, to utilize her income tax return. I think that's really the best way to encapsulate what her income is and the best way to compare it from tax year 2013 to tax year 2012 to 2011. Because as a self-employed individual, you've got the ability to manipulate that. But eventually, you've got to take that income. So if the income is projected and it turns out not to be that high, you're saying the debtor can come in and adjust it going forward? I think Judge Saldino was very open to the idea, and I know my client has been open to the idea, that if her income goes down, she can file a motion with the court to modify her plan and come in and make proof that her income has gone down. We've never agreed with that notion. I see that I'm into my rebuttal time at this point. I will be very quick in saying that we obviously have to determine, in order to determine disposable income, reasonable and necessary expenses. The bank made a number of objections to a number of her expenses. That's set forth in the brief. Unless you have specific questions on that, I'll hold onto the rest of my time. But does disposable income really pale because she's in the position of having to pay 100%? It really pales in importance, it seems to me, how she gets you to the finish line. As long as your position is 100 cents on the dollar. But that's assuming that the absolute priority rule applies. If the absolute priority rule doesn't apply, then this court and the bankruptcy court have to make the determination as to what her disposable income is because that's all we can receive at that point. We think her disposable income is well in excess of $4,500. Thank you. I didn't mean to erode your time. No, you're fine. Thank you, and I'll see you in a couple of minutes. Thank you. Good morning, Mr. Hahn. Good morning, Your Honor. Please support. My name is John Hahn, and I represent Dr. Woodward in this bankruptcy. Just a couple points of clarification, if I may. Dr. Woodward does not own a clinic. She has an interest in a partnership with her pathologist. Secondly, Dr. Woodward does disagree with the bank as to the use of the funds. It's her position that those monies went into the construction company. Is there anything in the record about that one way or another? I believe only testimony probably early on in the Chapter 7 bankruptcy when there was the issue that came up as to whether or not this was consumer debt or was it business debt, and that would have been the early part of the Chapter 7. And that issue was not pursued or contested. You instead converted the case on behalf of Dr. Woodward. That is correct, Your Honor. We abandoned the issue of maintaining it in a Chapter 7 simply in hopes or belief that Dr. Woodward would be able to get a confirmed plan based upon the status of the law by Judge Saladino at the time of which she then proposed her disposable income over the five-year period of time. Was she not or is she not a member of the pathology specialist LLC? Yes, she is a member, Your Honor. But there is no clinic per se. They simply work out of a hospital. So when Mr. Rauer said she owned a clinic, I didn't want to get the impression that she owned like a physical building or anything of that nature. Mr. Rauer did, I believe, set forth a summary of what their position is. Obviously, Your Honors, we believe that Judge Saladino was correct. We believe the broad view is the more appropriate way. Unfortunately, we have no legislative history to tell us what Congress intended or did not intend to do. And in Mr. Rauer's brief, he talked about it's clearly the intent. Well, there's no intent there to tell us what Congress intended to do. I think we set forth our position fairly clearly. We would urge this court to adopt Judge Saladino's opinion and believe that the broad view is the correct view. You would agree that the three circuit courts of appeal that have decided it have gone to the bank's point of view? Yes, I recognize that, Your Honor. There's actually, I think there's four. Is it four now? I think there's four now that have actually gone to the narrow view. That's correct. I think it's the 4th, 5th, 6th, and 7th. I don't believe there's been any circuit cases that have came down either way. So we're at that position. I think this court on the impaired class really did hit the nail on the head in that the bank did not appeal that determination by Judge Saladino that that is an impaired class. As the court is well aware, the impaired class is any impairment, any alteration of legal rights, and so forth. I thought that the issue was they didn't appeal the objection to the claim. They still appeal the treatment of that claim under the plan as impaired. Am I following your argument correctly? I just want to make sure. Yes. That's correct. That's correct. So I believe that that issue, in my opinion, is moot in that their objection was not appealed to the claim because they said it wasn't a claim. And I want to emphasize that that claim arose between the time of the filing of the petition, the chapter 7, and the chapter 11 is when that claim actually arose. Are you speaking of the Elliott claim? Yes, the Elliott claim. If the Elliotts aren't entitled to vote, would you agree the case has to be sent back for another confirmation hearing? Yes, I would say that, Your Honor. Unfortunately, that's the situation. We had no votes of any other unsecured creditors. We got a rejection vote from the bank. And so at that point in time, even if I could get other creditors, unsecured creditors to agree, I still couldn't move forward because the bank's claim is so large that it will never carry the second prong of the test. That's correct, Your Honor. That's why they're in a blocking position. That's correct. But is there some reason you can't propose a plan that goes out over a lengthy period of time? I don't know what Dr. Woodward's age is, what would be feasible, but is there some reason you can't do that? No, there would be no reason that we could not, but, again, the bank's position is 100% payment, and with that in mind, it could be a 20-year payout plan. So it becomes somewhat impractical, too, in that sense, for Dr. Woodward to even be able to complete a plan under those terms. So if you have that issue with regard to the plan, I guess I want to go back to something you said earlier, that your client disputes the basis of the loan, and I understand that the conversion to 11 may have been based partly on her income, which was above the means test level. Correct. What would prevent you from converting back to a 7 and fighting about the issue about whether the debt is primarily business or personal at this point? I mean, what you said was we converted to an 11 hoping to get a consensual plan or to get a plan confirmed, and that hasn't happened for a number of years. Correct. So I guess I'm wondering why we're continuing down that path, if there are other alternatives, as Judge Fetterman explained. I do believe that that could be an option. The matter of the fact is I believe the U.S. Trustee's Office, quite honestly, would fight a conversion to a 7 as much as Dr. Woodward does make a substantial income, and they would say that that is abuse of the bankruptcy system. Unless it's all commercial or business debt. I mean, if it's not consumer debt, then it doesn't matter how much she makes. Well, that is correct, Your Honor, but the U.S. Trustee's Office in Nebraska, quite honestly, is taking a very hard look at even though it is a business debt, if there's a substantial income, that they may, in effect, go after that as an abuse. Well, I don't mean to sidetrack you from your argument. And I guess I'd say the U.S. Trustee isn't the court. I understand, Your Honor, but we have to fight that. In any event, Doctor, the doctor doesn't have attractive alternatives. That is correct, Your Honor. There really is not a lot of alternatives. With regard to the disposable income, obviously this court, in order to modify the disposable income issue, you would have to say that Judge Saladino, in review of the facts, was a clear error and it was an abuse of discretion. I believe Judge Saladino clearly went through the details. If you read the transcript, you will see where he specifically went through, in his own mind, as to allowance of expenses or denial of expenses. And at the time of trial, the judge basically said to Doctor Woodward and myself, we think he felt that there was a little bit more room in the disposable income and suggested to us that if he was going to rule from the bench, it would be a $4,500 per month payment to unsecured creditors. And we, at that point in time, made an oral request to amend from $3,500 to $4,500. I believe Judge Saladino, in reviewing those expenses, did it appropriately. I do not believe he did anything that was not substantiated by the facts of the case. It was not an abuse of discretion nor was it a clear error of any findings of those facts. The issue that the bank raises with regard to the self-employment tax, I would like to just address that just briefly. In their practice, as in law firms, if there is an employee's or an employer's tax that they effectively pay, it effectively gets deducted from the salary or the draws that they get. So it's not a non-cash item that the bank is wanting this court to believe. It is because her gross income is reduced by not only the portion that she pays as an employee, but also as to the business. In other words, it gets put into the pot and that is deducted from her salary or her draw. So it is not a double dip as the bank is wanting this court to believe. It is an actual draw because if you take the gross, less expenses, it is a legitimate expense that she has to cover before she gets her salary. The other items, Your Honors, quite frankly, I believe are very reasonable. They are not extravagant. So for that reason, we would ask the court to affirm the Judge Saladino's confirmation order. Thank you very much. Thank you, Mr. O'Hanlon. Good morning again. I'm going to be very brief. I guess I just want to simply make a remark as it relates to Mr. Han's last comment on the self-employment taxes. I still think Mr. Han is wrong. I think you can take a look at the reply brief. I think that sets it out pretty clearly what the circumstances are, so I won't get into different lines of her tax return. I know you don't want to listen to that, so I won't do that, but I think the reply brief hits on that. Other than that, I don't have anything further. Just thank you for your time this morning. Thank you. Thank you, folks.